# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

MARK A. KLEPPER,

        Plaintiff,

vs.

MICHAEL J. ASTRUE[1],
Commissioner of Social Security,

        Defendant.

No. C06-4079-MWB

**REPORT AND RECOMMENDATION**

_____

## *I.  INTRODUCTION*

The plaintiff Mark A. Klepper ("Klepper") seeks judicial review of a decision by an administrative law judge ("ALJ") denying his applications for Title XVI Supplemental Security Income ("SSI") and Title II disability insurance ("DI") benefits.  Klepper claims the ALJ erred in (1) failing to develop the record properly regarding his mental impairment, (2) weighing the evidence, (3) assessing his residual functional capacity and credibility, and (4) presenting an inaccurate hypothetical question to the vocational expert. (*See* Doc. Nos. 9 & 11)

## *II.  PROCEDURAL AND FACTUAL BACKGROUND*

### *A.  Procedural Background*

On April 22, 2004, Klepper protectively filed applications for SSI and DI benefits, alleging a disability onset date of March 16, 2004.  In his application, Klepper claimed he was disabled due to "[p]inched nerves in neck – partial paralyzed left hand and part of left

---

[1]This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration ("SSA").  On February 12, 2007, Michael J. Astrue became Commissioner of Social Security.  He therefore is substituted as the defendant in this action.  *See* Fed. R. Civ. P. 25(d)(1).

side of face. Limited use of left hand due to diminished strength." (R. 63) Klepper's applications were denied initially and on reconsideration. Klepper appealed, alleging he had developed new illnesses and conditions since his previous disability report. Specifically, he alleged he had developed loss of short-term memory and confusion, high blood pressure, Graves Disease, and hyperthyroidism, and his "stroke was confirmed." (R. 102) In addition, through the testimony adduced at the ALJ hearing and further documents submitted by Klepper, he also asserts he is disabled due to constant headaches, depression, and fatigue.

On November 18, 2005, a hearing was held in Spencer, Iowa, before ALJ Robert Maxwell. Klepper was represented at the hearing by attorney David J. Stein. Klepper testified at the hearing, and Vocational Expert ("VE") Tom Audet also testified. On January 26, 2006, the ALJ ruled Klepper was not disabled and not entitled to benefits. (R. 17-28) Klepper appealed the ALJ's ruling, submitting additional medical records, and on August 2, 2006, the Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner. (R. 6-9)

Klepper filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Klepper's claim. Klepper filed a brief supporting his claim on February 1, 2007. (Doc. No. 9) The Commissioner filed a responsive brief March 30, 2007. (Doc. No. 10) Klepper filed a reply brief on April 9, 2007. (Doc. No. 11). The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Klepper's claim for benefits.

2

### B. Factual Background

#### 1. Introductory facts and Klepper's hearing testimony

Klepper was born in 1965, making him forty years old at the time of the hearing. He is divorced and has no dependent children. (R. 368) He lives alone in Spirit Lake, Iowa. He had a stroke at the end of August or early in September 2003, resulting from an accident in which a large tree limb fell on him. He was treated at the University of Iowa Hospital, and he has continued to receive testing and treatment there since the stroke. According to Klepper, his neurologist has informed him that the brain function he lost due to the stroke will not return. (R. 244-45) He stated he has suffered some memory loss as a result of the stroke, and he has difficulty recalling what day it is or the date, names, and people's faces. (R. 349)

Klepper stated the stroke has left him with a paralyzed left arm, and his shoulder now is "starting to lock up." (R. 346) He was left-handed prior to his stroke but now must use his right hand, which he finds very frustrating. He stated his writing sometimes is illegible, and he has lost the ability to engage in hobbies and sports he enjoyed prior to the stroke. For example, he used to paint miniatures, fly stunt kites, and ride a mountain bike, and he has been unable do those activities since he lost the use of his left hand and arm. (R. 357; *see* R. 64) He estimated he has regained perhaps sixty percent of the strength in his left arm, but the fingers in his left hand are weak and they will move only in unison, not individually. (R. 349) He is unable to manipulate small objects or grasp things reliably with his left hand. (*Id.*)

Klepper stated his impairment also has prevented him from working. He has sent out "a lot of resumes," but according to him, employers will not hire him with his impairment and because he could have another stroke. (*Id.*; R. 359) In addition, he stated he is "in the hospital every other month, sometimes twice a month," and potential employers view him as a liability. (R. 359) All of Klepper's past work has been as a cook

3

(*see* R. 161), in which he used his left hand to hold a knife.  He believes his inability to use his left hand would prevent him from returning to work as a cook/chef.  (R. 349)  He worked as a cook from November 13, 2003, to March 16, 2004, at the Spencer Country Club, but according to Klepper, the job ended because he could not keep up with the other cooks.  (R. 366-67)  He quit the job voluntarily because he was not getting enough hours, but he believes the reason he was not getting the hours he wanted was due to his poor performance.  (R. 371-72)

Klepper stated his goal is either to retrain so he is able to cook by using his brain more and his body less, or perhaps to have a home-based business of some type.  (R. 367)  He would like to go to school and study "business management, web design, computer system drafting, or . . . health inspector."  (R. 368)  He indicated voc-rehab will pay for his schooling and he was scheduled to take an aptitude test, but he would need refresher courses in math skills and writing skills before he could get into college or a technical school.  (*Id.*)

Klepper indicated he suffers from migraine headaches on a daily basis.  The headaches began the day after his stroke, when he "had a terrible migraine, about level seven or eight, and ever since that day to the present [he has] had a migraine headache everyday from morning until night, ranging from three to five all the way up to nine and ten in severity."  (R. 347)  He indicated his only reprieve from the migraines is to sleep.  He also had a brief reprieve from the headache pain when he had surgery to remove his thyroid and he was on narcotic pain medications for a couple of days.  (R. 351)  As a result of the migraines, Klepper takes frequent breaks, lies down to rest, or takes naps.  He stated he sometimes does not leave his house for days at a time because his eyes will be too sensitive to light, cold, or wind.  (R. 347)

Klepper also described problems with his lower back.  He stated that in 2000, he lived in Green Bay, Wisconsin, and was working as a caterer.  He fell down a flight of

cement steps and injured his lower back. According to Klepper, he suffered three herniated discs and a pinched sciatic nerve. He was off work for several weeks after the accident, and stated he has had problems with his back ever since that time. He uses a cane to walk, and he is unable to walk long distances. (R. 347-48)

Klepper has type II diabetes, and stated he takes insulin and Metformin in the morning and at night. He tests his blood sugar several times a day. Klepper attributes his fatigue to his diabetes. He stated his blood sugar dropped dramatically on two occasions and he "came close to going into diabetic shock," so he carries glucose tablets with him wherever he goes. (R. 348) He also has Graves' Disease, which requires him to use lubricants in his eyes at night and has caused some problems with swelling in his eyes. (*Id.*)

Klepper indicated that in addition to medications for hypertension, diabetes, and thyroid deficiency, he takes amitriptyline "[f]or depression and as a sleep aid and for chronic pain." (R. 350) His medications cause him to have dry mouth, dizziness, nervousness, and irritability. (R. 351) According to Klepper, his depression has resulted from his situation since his stroke. He stated that after the stroke, he lost his girlfriend, the house he was renting, his car, and most of his possessions, which he has had to sell in order to get by. He stated he has lost the ambition to go anywhere or do anything, and he has difficulty completing ordinary tasks due either to fatigue or because he loses interest. His only regular activity is taking care of his roommate's two dogs. (R. 350-51)

Klepper obtained a G.E.D. in about 1983. In about 1986 or 1987, he worked doing odd jobs through a temporary agency, but otherwise, he has worked as a cook and in other positions in restaurant kitchens throughout his working career. According to Klepper, he cannot work as a cook any longer because he is unable to lift a bucket of hot soup, use a knife properly, cut vegetables, or do the type of multi-tasking he indicated is necessary to work in a restaurant kitchen. He stated his problems with memory loss also would

5

preclude him from working as a cook because a chef must remember orders, food prep lists, inventory, and other matters. (R. 352-53) He stated he would be unable to keep up with the other cooks, or with orders from customers. (R. 354)

In addition, Klepper stated his migraines cause him to be very sensitive to light, and the constant pain causes him to be irritable, both of which would affect his ability to work. The migraines also make him nauseous. (*Id.*) Overall, Klepper stated his condition would prevent him from working either as a cook or in any of the odd jobs he has done in the past. (R. 355)

Klepper stated he has attempted to get work through temporary agencies in Spencer, Iowa. According to Klepper, the agencies were unable to find work for him, and they referred him to vocational rehabilitation, where he was found to be unable to work without some type of retraining. (R. 356; *see* R. 162, letter from voc-rehab counselor)

Regarding his functional limitations, Klepper stated if he stands for a long period of time, his "lower back ends up going out" and causes him severe pain. (R. 357) He can sit without much difficulty as long as his legs are straight, but he has problems bending his right knee. He had surgery on his right knee to repair a broken kneecap, and a second surgery "to fix and remove torn cartilage and ligaments." (*Id.*) According to Klepper, he now has "water on the knee and it swells." (*Id.*) Klepper indicated he can walk more than half a block only if he uses a cane and stops frequently to sit down and rest. (R. 358) Klepper estimated he can lift twenty-five to thirty pounds with his right arm, but he can lift very little with his left arm. He stated that although there is no medical problem with his right arm, if he lifts something too heavy, it puts stress on his lower back. (*Id.*)

Klepper stated he has had some physical therapy on his left hand and arm. According to him, he has suffered some muscle loss in his left shoulder, but his shoulder is no longer "locking up like it was." (R. 369) He can make a fist with his left hand, but he cannot touch his thumb to each of his fingers, pick up small objects, use tools, or write

6

with his left hand.  He stated that in his physical therapy sessions, he is working on opening a doorknob with his left hand.  He can use his left arm minimally to help himself balance, but otherwise, he has no functional use of his left arm and hand.  (R. 369-70)

Klepper stated he last saw a doctor for his knee problems in 1997, when he "slipped in the kitchen and tore the cartilage."  (R. 361)  He last saw a doctor for back problems in 2000.  He saw a neurologist in Iowa City more recently for his migraines, but stated he takes only aspirin for the migraines.  (R. 361)  Although Klepper stated he takes amitriptyline for chronic pain and depression, he has never seen a psychologist.[2] According to Klepper, his neurologist at the University of Iowa recommended he be seen at the mental health clinic there, but he has not had transportation to Iowa City because the state program that pays his medical bills has stopped providing transportation.  (R. 361-62)

Klepper stated the only work restriction his doctors have imposed on him is to avoid hazardous activities due to his impaired coordination.  (R. 363)  According to him, his doctor also has recommended memory testing, but that has not occurred yet.  No doctor has diagnosed him with memory loss.  (R. 363-64)  Klepper draws his own insulin and injects himself, all of which he does with his non-dominant right hand.  He uses a cane, which he stated was prescribed by a doctor.  He has no vision loss, but his eyes sometimes are very sensitive to light, cold, or wind.  (R. 364)


### 2.    *Klepper's medical history*

On August 14, 2003, Klepper was injured while he was cutting trees.  A branch fell on him and knocked him backward, causing him to hit his head on the concrete.  He experienced head pain and numbness, left arm stiffness, numbness in his left wrist and hand, and left leg stiffness.  (R. 182)  Klepper was seen in the Emergency Room at

---

[2]The record indicates Klepper began individual counseling at a mental health center in Spirit Lake, Iowa, in June 2006.  (*See* R. 335, 337)

Spencer Municipal Hospital on August 16, 2003, with complains of persistent left arm weakness and heaviness, and numbness in the left side of his face. A head CT showed "moderate ethmoid sinus disease," but otherwise was normal. (R. 163-69)

Klepper saw chiropractor Elizabeth C. Kressin, D.C. for a few weeks following his injury, but he discontinued treatment on September 24, 2003. As of that time, the doctor recommended Klepper not lift over ten pounds, avoid climbing or crawling, and "work in an environment that [was] room temperature and free of hazards." (R. 170) She also indicated Klepper would have difficulty with handling due to his left upper extremity weakness and numbness. (*Id.; see* R. 172-85))

The next record of Klepper being seen by a medical professional is a report from a comprehensive disability examination by Gary Rasmussen, D.O. on May 28, 2004. (R. 189-92) Klepper complained of left hand and face paralysis, and daily headaches with pain at a level of seven to nine on a ten-point scale. (R. 189) Dr. Rasmussen's impressions included Graves'' disease, untreated for several years; migraine headaches; and "[l]eft-sided upper extremity hemiparesis and left-sided facial weakness secondary to spinal cord trauma." (R. 190) Dr. Rasmussen's recommendations regarding Klepper's disability included the following:

> As far as disability is concerned, this patient in his current state should not and cannot lift or carry anything more than what he can carry with one hand. Standing, moving about, walking, and sitting in an eight-hour workday would be all right. Stooping, climbing, kneeling and crawling are not possible for this patient because of the restriction with his left arm as it is quite weak and has contracture deformities developing in the shoulder and forearm and hand. Handling objects with his left hand would be almost impossible. Seeing, hearing, speaking, and traveling should be all right. Work environment hazards are not of issue.

(R. 190-91) The doctor noted further that Klepper was unlikely to regain complete function of his left arm and hand even with neurosurgical treatment. (R. 191)

8

Dr. Rasmussen referred Klepper to the University of Iowa Hospitals and Clinics for consultation in the Neurosurgery and Endocrinology Clinics.

On July 13, 2004, Jan Hunter, M.D. reviewed the record and completed a physical Residual Functional Capacity Assessment form regarding Klepper. Dr. Hunter found Klepper would be able to lift twenty pounds occasionally and ten pounds frequently; stand and/or walk for about six hours in a normal workday; sit for about six hours in a normal workday; and push/pull with his right hand/arm without limitation. The doctor found Klepper could climb ramps and stairs occasionally, and balance, stoop, kneel, crouch, and crawl frequently, but he should never climb ladders, ropes, or scaffolds. The doctor noted Klepper's left upper extremity essentially is paralyzed and nonfunctional. No other limitations were noted in Klepper's functional abilities. (R. 207-14, 216) On September 28, 2004, J.D. Wilson, M.D. reviewed the record and concurred in Dr. Hunter's findings. (R. 214-15)

Klepper was seen in the Internal Medicine-Endocrinology Clinic (the "IM-E Clinic") on August 25, 2004. (R. 256--58; *see* R. 253-55) Doctors diagnosed him with hyperthyroidism, with evidence of thyroid ophthalmopathy. They noted Klepper was "currently on Tapazole," and they considered the possibility of radioactive iodine therapy as well as further evaluation and testing. However, they noted Klepper was scheduled to be seen in the Neurology Clinic for an MRI and MRA, and they deferred further workup to that clinic, with plans to do an orbital ultrasound when Klepper returned to the IM-E Clinic at a future date. (R. 253-54)

Klepper was seen in the Neurology Clinic on September 2, 2004. Klepper underwent an MRA of his neck that showed Klepper's left arm weakness was caused by "a stroke in the right brain." (R. 245, 273-74) Doctors opined the stroke likely was from his fall; however, they indicated the stroke also could be due to an abnormality in Klepper's heart, and they recommended he undergo a heart ultrasound, as well as a

9

followup neurology evaluation. They advised Klepper to take one aspirin daily to prevent further strokes. (R. 245) In addition, doctors recommended Klepper keep his blood pressure under control and stop smoking. (R. 251) They referred Klepper to Physical and Occupational Therapy for his left arm, and it appears Klepper was instructed in a series of exercises to increase his ranges of motion. (R. 259-65) For Klepper's headaches, doctors started him on amitriptyline 25 mg at bedtime, increasing up to 50 mg as tolerated and needed. (R. 251-52) He was directed to return to the Neurology Clinic in three to four months for followup. (R. 251)

On September 8, 2004, Klepper was transported by ambulance to the hospital in Spirit Lake with a complaint that his legs would not work. Klepper reported that he had awakened about 4:30 a.m. with pain in his legs, and his legs felt like Jello and "did not want to work right." (R. 195) He sat down in a chair, where he had remained until he called for help at 7:35 a.m. Klepper was unable to bear any weight at all on his legs and had to be lifted onto the exam bed. He denied any pain unless he tried to move his legs, when his muscles went into spasm. Lab tests showed Klepper had low potassium levels, and he was treated with IV and oral potassium. He was transferred to the University of Iowa Hospital at approximately 10:20 a.m., with his condition noted as "serious." (R. 194-206) When Klepper's potassium was checked at the University of Iowa ER, his level was within normal limits, and Klepper had regained almost normal motor power and was able to walk and stand on his own. (R. 246) He was able to stand up from a squatting position with minimal support. (R. 247)

The same day, Klepper was examined in the IM-E Clinic. His thyroid was noted to be about three times the normal size. He reported being off medication for his Graves' disease for several years due to financial reasons. Since August 25, 2004, when the IM-E doctors had prescribed new thyroid medications, Klepper had been taking the medications as prescribed and he was "feeling somewhat better, calmer with less tremulousness and

10

jitteriness and palpitations." (R. 246) Doctors increased the dosage of Klepper's thyroid medication, and also prescribed propranolol, a blood pressure medication. They noted control of Klepper's blood pressure is important to prevent further paralytic episodes, and they advised Klepper to avoid large carbohydrate intake which could result in further low potassium incidents. (R. 248; *see* R. 246-48)

Klepper was seen in the IM-E Clinic for followup on September 22, 2004. He reported feeling well since his last visit, "with no further episodes of weakness [sic] or hypokalemia." (R. 243) His thyroid medication was continued without change. His blood sugar was somewhat high, and he was scheduled to return for a fasting blood sugar test. He was advised to avoid a high carbohydrate intake, and was referred to a dietitian for consultation. (R. 244)

Klepper underwent an echocardiogram on October 20, 2004. The study showed a "[p]robable right ventricular enlargement," and no other abnormalities. (R. 241-42)

Klepper was seen for followup in the Neurology Clinic on December 28, 2004. He complained of a constant headache since his last visit, although the amitriptyline had reduced his pain level to about five on a ten-point scale. He had stopped taking daily Ibuprofen or Tylenol two to three weeks prior to this visit, as directed by his doctor to prevent possible rebound headaches; however, he stated his headaches had not improved since that time. In addition to his ongoing headaches, Klepper complained of lower thoracic and upper lumbar back pain bilaterally for two to three months. He indicated the pain sometimes radiated down the backs of his legs into his heels, and the pain worsened when he was up and walking. Klepper also complained that he had been experiencing memory problems for about two months. He speculated that he had had the memory problems since his stroke, but he had become more aware of the problem recently because a friend had pointed it out to him. With regard to his left arm and hand paralysis and

11

weakness, Klepper was doing home exercises regularly, and he stated his strength had increased significantly since his last visit. (R. 235)

Klepper was advised to continue taking a daily aspirin for stroke prevention. He was continued on amitriptyline for his headaches, and Phenergan was added while Klepper continued weaning himself off of Ibuprofen and Tylenol. Doctors indicated that if Klepper's back pain increased or he developed additional symptoms, an MRI would be considered. Klepper was referred for a Neuropsychiatric evaluation and assessment for cognitive rehabilitation. Notes indicate Klepper had worked as a cook until he lost the use of his dominant left arm, and he did not "appear very motivated to be retrained for [any] other occupation." (R. 237) He was advised to return for followup in six months. (*Id.*)

On December 29, 2004, Klepper was seen in the IM-E Clinic for followup. (R. 225-27) A report from the Department of Ophthalmology and Visual Sciences indicated Klepper "has diplopia and only extremes of lateral gaze." (R. 228) The report indicated stabilization of Klepper's thyroid disease might stabilize his eye condition, as well. The report also indicates Klepper was "currently using a cane." (*Id.*) At the IM-E Clinic, Klepper reported taking his thyroid and blood pressure medications as directed, except for a three-week period when his prescription did not arrive by mail. Doctors reduced the dosage of Klepper's thyroid medication, and continued his blood pressure medication without change. They "very strongly encouraged [him] to discontinue smoking," noting smoking could make his condition worse. They recommended the possibility of radioactive iodine treatment coupled with a steroid for eight to twelve weeks to prevent worsening of his orbitopathy, but they also noted the use of radioactive iodine while Klepper continued to smoke could make his condition worse. Klepper indicated he wanted to consider his options, and he was directed to call the clinic the following week to discuss his lab results. He was directed to return for followup in six weeks. (R. 226)

Case 5:06-cv-04079-MWB   Document 13   Filed 08/22/07   Page 12 of 31

Klepper was seen for occupational therapy on December 29, 2004. (R. 231-32) Upon examination, Klepper showed significant deficits in both sensation and movement of his left arm and hand. He had no functional grasp with his left hand and poor pinches. He had made some minimal progress in using his hand for activities of daily living, largely through the use of homemade adaptive tools, but he continued to have difficulty with buttons and zippers. Klepper indicated he had gained thirty to forty pounds over the previous two months, which he believed was due to his medications. He stated his back pain had increased along with his weight, and he now used a cane to support himself due to his back pain and the resulting reduction in his endurance. The therapist noted the following regarding Klepper's desire to return to work: "[He] is a former cook and would dearly love to return to that job, but he would do almost any other job that would let him be a viable employee or pursue a ful-time occupation and be off of disability." (R. 232) The therapist found Klepper cooperative and willing to learn. Klepper's short-term goals included being able to zip a jacket without looking, using a key pinch to pick up a pen, and being able to don a pair of gloves within one to two minutes. (*Id.*)

On February 10, 2005, Klepper returned to the IM-E Clinic for lab tests. Testing indicated a diagnosis of Type II diabetes, and Klepper was prescribed Metformin and Insulin to improve his glucose levels. His thyroid medication was increased. He was directed to return for a fasting test of his cholesterol levels, which were noted to be "not the greatest." (R. 217-24)

Klepper returned to the IM-E Clinic for followup on May 25, 2005. (R. 285-86) He reported difficulty swallowing solids despite some decrease in the size of his thyroid gland. He was monitoring his blood sugar at least three times daily and was doing well keeping his blood sugar under control. Notes indicate Klepper had maintained telephone contact with the clinic. Klepper was referred, at his request, to the Ear, Nose, Throat department for evaluation of a possible thyroidectomy. He again was advised to stop

13

smoking. (*Id.*) Klepper's lab tests resulted in another increase in his thyroid medication, and showed his diabetes was under excellent control, with no current effect on his kidneys. Doctors recommended Klepper start on a cholesterol lowering medication, and restrict his total fat intake to less than 30%. (R. 283-84)

Klepper apparently underwent a total thyroidectomy on June 10, 2005, although the operative records are not in the administrative record. (*See* R. 275, 282) He suffered some right vocal cord paralysis as a result of the procedure. On June 16, 2005, he had an injection of Cymetra into his right vocal cord, which provided some improvement in his voicing. He was directed to return in one to two weeks for possible repeat injection. In addition, Klepper reported he was down to four or five cigarettes daily, and he request assistance with smoking cessation. A course of nicotine transdermal patches was prescribed. (R. 275)

The pathologist who evaluated Klepper's thyroid following his thyroidectomy noted the presence of Langerhans cell histiocytosis (LCH).[3] On September 16, 2005, Klepper was evaluated in the Internal Medicine-Hematology/Oncology Clinic as a result of the pathology findings. (R. 279-80) Notes indicate LCH "can be unifocal or multifocal (primarily in the bone, less often in the lung, skin, or lymph nodes; diabetes insipidus occurs in up to 30% of patients)." (R. 280) Doctors recommended Klepper have a complete staging evaluation to determine the extent of the disease, and a bone scan,

---

[3]    Langerhans cell histiocytosis (LCH) is a rare disorder that occurs when there are too many of a type of white blood cell called a Langerhans cell (named for a German scientist). These cells normally reside in the skin and help fight infections and destroy certain foreign substances in the body. In LCH, these cells accumulate on bones and other parts of the body, particularly the head and neck, causing a wide range of problems. . . . Common symptoms include: skin rash, tenderness or pain originating from a bone, loose or lost teeth, swollen gums, multiple ear infections, eyelid swelling and other vision problems, excessive thirst and urination, fever and night sweats, weakness and failure to gain weight.

http://www.childrenshospital.org/az/Site1101/mainpageS1101P0.html (Aug. 21, 2007).

skeletal survey, and pulmonary function tests were ordered. (*Id.*) Appointments were scheduled for November 15, 2005 (R. 277), but there is no indication in the administrative record as to whether or not Klepper kept those appointments.

The Appeals Council had the benefit of the following medical records in addition to those summarized above. On February 28, 2006, Klepper was admitted to the Neurology service at the University of Iowa Hospital with complaints of headache and persistent depression. Notes indicate Klepper had written a note to the attending physician the previous Fall in which Klepper indicated "that if his head pain and low back pain did not improve, he was contemplating suicide." (R. 310) The doctor called Klepper to discuss getting him some psychiatric treatment, but Klepper assured the doctor he was not suicidal. (*Id.*) At the time of this hospital admission, Klepper indicated he knew he could get free psychiatric care at a local clinic, but he did not want to be treated there because his brother, a paranoid schizophrenic, had a bad experience at the free clinic. Klepper stated he could not get financial assistance for psychiatric care outside of the University of Iowa clinics. (R. 310-11)

Notes further indicate that although 100 mg/day of amitriptyline had helped Klepper's headache pain, he had weaned himself back to 25 mg/day due to financial hardship, and his headache pain was back up to seven or eight on a ten-point scale. He complained of pain "all over his head" that felt "like steel bars going through his head." (*Id.*)

Doctors assessed Klepper with posttraumatic headaches with "a migraine quality to them." (R. 312) They prescribed an inpatient trial of IV Thorazine treatment. They also administered amitriptyline. As of March 4, 2006, Klepper's headache was still at four on a ten-point scale. He was discharged that date in stable, alert, oriented condition, with prescriptions for Prozac, Amitriptyline, Synthroid, and Phenergan. He was directed to return in three months for a neurology followup. (R. 310-23, esp. R. 323)

15

The consulting psychiatrist noted Klepper had "a longstanding history of depression since approximately 1999 precipitated by many life stressors," and exacerbated since then by his "multiple medical problems as well and financial difficulties that have limited his ability to get appropriate treatment." (R. 316) Klepper reportedly had been homeless for about three months, when he lived under a bridge. He collected pop cans for extra money, and stated he had had to borrow money from friends and relatives and collect cans to gather enough money to get to the hospital. He complained of sleep disturbance related to his pain and depression; loss of interest in usual activities; low energy and reduced ability to concentrate; weight gain of 100 pounds since his stroke; and daily thoughts of "wishing that he was not alive," although he had no plans to commit suicide. (R. 314) He was diagnosed with Major Depressive Disorder, recurrent, moderate. Doctors started him on Celexa, and directed him to follow up with a local mental health center. (R. 316)

On March 27, 2006, Klepper underwent a whole body bone scan for staging of his LCH. The scan revealed the probability of degenerative joint disease in Klepper's right ankle, and likely dental disease. (R. 332)

In June 2006, Klepper began individual counseling with a licensed mental health counselor at The Lakes Counseling in Spirit Lake, Iowa. His counselor expressed concern that Klepper's financial situation made him unable to get the medical assistance he needed. She indicated Klepper "would benefit from having a psychiatrist for med checks to monitor his Prozac, and other medications, as well as to offer a diagnosis for his mental health concerns." (R. 335; *see* R. 337)

### 3. *Vocational expert's testimony*

The VE indicated Klepper would have transferable skills to other types of cooking occupations. However, he indicated that if Klepper's subjective complaints are found to be fully credible, he would be unable to return to any of his past relevant work, and he

16

furthermore would not be employable in any occupation. The VE stated that considering "the combination of the totality of all his impairments, including the migraine headaches, . . . absenteeism would be an issue in any occupation that he would be capable or qualified for, to do." (R. 375)

The ALJ asked the VE to consider an individual of Klepper's age, and with Klepper's education and work experience, who has the following functional limitations:

> This would ask you to assume a person who could occasionally lift and carry 20 pounds, frequently 10 pounds, could stand, walk or sit with normal breaks about six hours of eight, push/pull activities they do not limit in the lower extremities, . . . [and] there would be limits in push/pull activities with the left upper extremity. Posturally, no climbing of ladders, ropes or scaffolds, occasionally climb ramps or stairs, otherwise postural activities could be done frequently. No visual, communicative or environmental limits with the manipulative function . . . the left upper extremity is essentially paralyzed and nonfunctional so it looks like no useful function with the left upper extremity, the right upper extremity there's no limitation medically.

((*Id.*) The VE indicated the hypothetical individual would be unable to work as a cook, but would be able to work in certain light occupations, including fast food worker ("basically the counter clerk kind of person at a fast food restaurant filling orders, that kind of thing"), or parking lot attendant. (R. 375-76) Both of these jobs would be in safe working environments with no exposure to hazards. (R. 377)

The VE noted it would make some difference that the now-paralyzed upper extremity formerly was the individual's dominant extremity. The individual's ability to work would depend on how well he is able to adapt and learn to use his non-dominant upper extremity. The VE indicated he would expect the individual to "be clumsier initially," but possibly to improve over time. (R. 376-77) The VE noted Klepper's ability to draw his own insulin and inject himself evidences his ability "to grip and probably do

17

some grasping activities and operate a syringe," indicating he has some use of his right arm and hand.  (R. 377)  However, the VE noted Klepper's testimony that he has not adapted well to using his right hand during the two years since his stroke (*see* R. 380) indicates "maybe he's going to have more trouble using the right hand to do work like tasks . . . [which] could affect his ability to work at competitive paces."  (R. 381) Considering Klepper's testimony that he has difficulty writing right-handed, and it takes him two to three times as long to complete tasks with his right hand as it did with his left, the VE would have concerns about his ability to maintain competitive employment.  (*Id.*)

The VE noted the DOT descriptions do not indicate either fast food worker or parking lot attendant can be performed by someone with the use of only one arm.  Rather, the VE indicated his opinion was based on his own experience from twenty-five years of doing rehabilitation work.  He further noted nothing in the DOT references for the two suggested jobs would actually conflict with his opinion.  (R. 378)

### 4.     *The ALJ's decision*

The ALJ found Klepper has not engaged in any substantial gainful activity since his alleged disability onset date.  He found Klepper met the insured status requirements as of March 16, 2004, the alleged disability onset date, and he will continue to meet those requirements through December 31, 2008.  (R. 18)

The ALJ found Klepper has a medically-determinable, severe impairment "consisting of history of vascular accident with paralysis on the upper left . . . [which] results in more than a minimal reduction in basic work like function[.]"  (R. 24) However, he found Klepper's impairment is not of Listing level severity.  (*Id.*)  The ALJ further found that although the record evidences several other major medical complaints, none of them has "been documented with objective medical signs and diagnostic findings to establish the existence of enduring complaints and the evidence does not show that these

18

complaints significantly compromise [Klepper's] function over time." (*Id.*) The ALJ found Klepper retains the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently, "in jobs that do not require a functional left upper extremity." (R. 25) He found Klepper can stand and walk for up to six hours in a normal workday, sit for six hours in an eight-hour workday; push and pull without limitation, except with his upper left extremity; occasionally climb ramps, steps, and stairs; and frequently balance, stoop, kneel, and crouch. He found Klepper should avoid jobs that would require crawling, rope climbing, scaffold climbing, or ladder climbing. (*Id.*)

The ALJ found Klepper's testimony and subjective complaints not to be credible for several reasons, summarized below:

1.      Klepper complains of marked loss of strength on the upper left as the result of an injury that occurred in September 2003. "However, within months, he went to work as a cook at a country club, . . . [which] is an unusual job selection for an individual who is reporting such extensive loss of function in an upper extremity." (R. 19)

2.      Klepper reported leaving his most recent job as a cook at a country club "because he was not getting enough hours, not because of his injury." (*Id.*)

3.      Klepper initially stated he had to use a cane to walk, but he later testified he only requires the cane if he has to walk more than half a block. (*Id.*)

4.      Klepper complains of depression and memory loss, but he has not been treated by a mental health professional and has not sought such care. In addition, although Klepper has complained of memory loss to his health care professionals, none of them has actually diagnosed memory loss or noted any evidence of memory loss. (*Id.*)

5.      Despite his claims of mental impairment and memory loss, Klepper has been approved for vocational rehabilitation training "for some challenging, skilled vocational pursuits." Thus, any mental limitations Klepper actually may have are not significant enough to prevent him from working. (R. 20)

Case 5:06-cv-04079-MWB   Document 13   Filed 08/22/07   Page 19 of 31

6. The opinion letter from Klepper's vocational counselor is not supported "by a formal, credible functional capacity evaluation conducted under the direction of a treating source," and none of Klepper's treating sources has said he is unable to work. (*Id.*)

7. Regarding Klepper's claim that he has to take frequent breaks and naps during the day due to fatigue, the ALJ noted Klepper "is an active candidate for a rigorous vocational training regimen. If [his] vocational counselor felt that [he] would be sleeping and taking breaks all day, it is unlikely that [Klepper] would be considered for such training." (R. 20-21)

8. In her medical source statement, Klepper's chiropractor, Elizabeth Kressin, "did not suggest any limitations flowing from what [Klepper] now describes as extensive limitations involving the back, the knee and the upper right." (R. 21)

9. As of Klepper's consultative examination in June 2004, he "had discontinued his treatment for hyperthyroidism and bulgy eyes about three years previous [and] he was not complaining of any related symptoms." (*Id.*) Despite Klepper's complaint of daily headaches, he was taking no medications, including over-the-counter medications, for the headaches or any other complaint. (R. 21-22) The examiner found Klepper "would be able to stand, walk, sit and move about without difficulty in one-handed or one-armed tasks." (R. 22) He indicated Klepper should avoid activities involving bilateral upper extremities, such as climbing and crawling, but he would have no sensory or communication deficits and no restrictions with respect to travel or work hazards. (*Id.*) The ALJ gave "[c]onsiderable weight" to the assessment by the consultative examiner, finding the assessment to be consistent with the examination and with the balance of the clinical record.

10. The ALJ found Klepper's "allegations regarding his numerous complaints and the associated limitations far exceed the underlying clinical record." (R. 25) The ALJ noted that prior to Klepper's pursuit of vocational rehabilitation assistance, "his activities

of daily living seemed quite normal, provided he could accommodate his left upper extremity." (*Id.*) The ALJ noted Klepper worked for a number of years even after his "remote musculoskeletal events in 1997 and 2000," and his medical treatment had, for the most part, been "quite conservative and routine." (*Id.*) The ALJ further noted Klepper had sought only minimal care for his ongoing complaints despite his obvious knowledge of community-based medical services. (*Id.*)

The ALJ found Klepper unable to return to any of his past relevant work. The ALJ accepted the vocational expert's opinion in finding Klepper retains the capacity to perform light work including, for example, fast food worker and parking lot attendant, although he cannot perform the full range of light work. (R. 26, 28 ¶ 10) Accordingly, the ALJ found Klepper was not disabled at any time through the date of his decision (January 26, 2006).

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Hillier v. Social Security*

*Admin.*, ___ F.3d ___, 2007 WL 1412404 at *3 (8th Cir. May 15, 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003. First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996).").

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is

considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in

23

significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir.

2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord*

25

*Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)  the claimant's daily activities;
> 2)  the duration, frequency and intensity of the pain;
> 3)  precipitating and aggravating factors;

26

4)     dosage, effectiveness and side effects of
medication;

5)     functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984).  *Accord Ramirez v. Barnhart*, 292 F.3d
576, 580-81 (8th Cir. 2002).  The court must "defer to the ALJ's determinations regarding
the credibility of testimony, so long as they are supported by good reasons and substantial
evidence."  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV.  DISCUSSION

Klepper argues the ALJ failed to develop the record adequately concerning his
mental impairment.  The court finds Klepper's argument persuasive.  The record as a
whole, including the additional evidence submitted to the Appeals Council, contains
notable evidence that Klepper suffers from depression.  Considering this evidence, the
Appeals Council should have remanded the case to an ALJ for further development of the
record.

In considering an argument that an ALJ has failed to develop the record fully, the
relevant inquiry is whether the claimant "was prejudiced or treated unfairly by how the
ALJ did or did not develop the record; absent unfairness or prejudice, we will not
remand."  *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) (citing *Phelan v.
Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)).  The court finds, in this case, that Klepper
was prejudiced by the ALJ's failure to develop the record regarding his mental
impairment.  Even prior to the additional records submitted to the Appeals Council, the
record contained enough evidence regarding Klepper's mental impairment to warrant
further inquiry by the ALJ.  Klepper testified his circumstances since his stroke have
caused him to become depressed.  He stated he has lost interest in going anywhere or
doing anything, and he has difficulty completing even ordinary tasks due either to fatigue
or because he loses interest.  He stated he takes amitriptyline for depression, as well as to

27

help him sleep. (R. 350-51) Viewed together with the additional evidence submitted to the Appeals Council regarding Klepper's mental condition, the court finds the Commissioner erred in failing to develop the record fully and fairly.

As the Eighth Circuit noted in *Battles v. Shalala*, 36 F.3d 43 (8th Cir. 1994), it is the Commissioner's duty:

> "'to develop the record fully and fairly, even if . . . the claimant is represented by counsel.'" *Boyd v. Sullivan*, 960 F.2d 733, 736 (8th Cir. 1992) (quoting *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983)). This is so because an administrative hearing is not an adversarial proceeding. *Henrie v. Dept. of Health & Human Serv.*, 13 F.3d 359, 361 (10th Cir. 1993). "[T]he goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice." *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988). Moreover, "[a]n adequate hearing is indispensable because a reviewing court may consider only the Secretary's final decision [and] the evidence in the administrative transcript on which the decision was based." *Higbee v. Sullivan*, 975 F.2d 558, 562 (9th Cir. 1992) (per curiam).

*Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994); *accord Cox v. Apfel*, 160 F.3d 1203, 1209 (8th Cir. 1998); *Johnson v. Callahan*, 968 F. Supp. 449, 458 (N.D. Iowa 1997); *Barry v. Shalala*, 885 F. Supp. 1224, 1241-42 (N.D. Iowa 1995).

In the present case, the record is inadequate to support a finding that Klepper is disabled due to a mental impairment, but the record contains adequate evidence that Klepper has a mental impairment to warrant further development. Ordinarily, this finding would justify a recommendation that the case be remanded for further development of the record. However, the court further finds the record does not contain substantial evidence to support the ALJ's determination that Klepper retains the residual functional capacity to sustain competitive employment.

The record as a whole in this case paints a picture of an individual with significantly more impairments and limitations than found by the ALJ. Many of the ALJ's stated

28

reasons for finding Klepper's testimony not to be credible are resolved by referencing the records as a whole. For example, the ALJ disbelieved Klepper's complaint of marked loss of strength on the upper left because he returned to work as a cook within months after the injury. The ALJ stated this was "an unusual job selection for an individual who is reporting such extensive loss of function in an upper extremity." (R. 19) The ALJ goes on to note that Klepper left the job "because he was not getting enough hours, not because of his injury." (*Id.*) There is nothing unusual in the fact that Klepper made an attempt to return to the only work in which he had any experience. The court finds credible Klepper's explanation that although he made the attempt, he was not able to keep up with the other cooks, and it was his inability to perform adequately on the job that led to his getting fewer hours than the other cooks. Furthermore, the record contains overwhelming evidence that Klepper has, indeed, lost most of the use of his left hand, and he has a marked decrease in the overall strength of his left upper extremity.

The ALJ found it inconsistent that Klepper initially stated he had to use a cane to walk, but he later testified he only requires a cane if he has to walk more than half a block. (*Id.*) Again, the court finds no inconsistency here; the latter statement merely clarified the former. Klepper's doctors made note of his use of a cane to walk, and Klepper reported to his physical therapist that he had begun using a cane after he gained considerable weight following his stroke. The added weight made him less steady on his feet and also affected his endurance. (*See* R. 228, 232, 347-48, 358, 364)

The record contains substantial evidence that Klepper suffers from unremitting headaches, fatigue, and difficulty functioning. The Eighth Circuit has cautioned:

> In evaluating a claimant's [residual functional capacity], "'consideration should be given to . . . the quality of daily activities . . . and the ability to sustain activities, interests, and relate to others *over a period of time*' and . . . the 'frequency, appropriateness, and independence of the activities must also be considered.'" *Reed [v. Barnhart]*, 399 F.3d [917], 922

29

[8th Cir. 2005)] (quoting Social Security Ruling 85-16) (emphasis in *Reed*).

*Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007). On this record, it is obvious that the quality of Klepper's daily activities, and his ability to sustain activities and interests over time, have been significantly impaired.

The court finds the record as a whole does not support the ALJ's conclusion that Klepper retains the residual functional capacity to maintain competitive employment. The evidence establishes that Klepper would be likely to have excessive absenteeism, which the VE indicated would preclude competitive employment.

Notably, Klepper's disability may not continue indefinitely. If he is able to retrain himself to use his right hand adequately, and he receives vocational rehabilitation assistance to develop new work-related skills, his period of disability ultimately may terminate. However, on this record, the undersigned finds Klepper is disabled.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[4] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and payment of benefits.

---

[4]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Case 5:06-cv-04079-MWB   Document 13   Filed 08/22/07   Page 30 of 31

In the alternative, if the district court finds the record does not contain substantial evidence to warrant reversal and remand for payment of benefits, then the undersigned recommends the case be remanded for further development of the record regarding Klepper's mental impairment.

**DATED** this 22nd day of August, 2007.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT